**Raymond VINCENT et al.**

v.

**GENERAL DYNAMICS CORP. et al.**

**Civ. A. No. 4–2221.**

United States District Court,
N. D. Texas,
Fort Worth Division.

Feb. 23, 1977.

---

788

Richard U. Simon, Jr., Brown, Crowley, Simon & Peebles, Fort Worth, Tex., for plaintiffs.

Otto B. Mullinax, Mullinax, Wells, Mauzy & Baab, Inc., Dallas, Tex., for International Ass'n of Machinists.

Sam Houston Clinton, Jr., Clinton & Richards, Austin, Tex., for Office & Professional Employees.

J. Olcott Phillips, McDonald, Sanders, Ginsburg, Phillips, Maddox & Newkirk, Fort Worth, Tex., for General Dynamics Corp.

## MEMORANDUM OPINION

MAHON, District Judge.

Plaintiffs, thirteen employees of General Dynamics Corporation [hereinafter "GD"] at its Fort Worth, Texas, facility, have sued their employer and the unions that are the certified collective bargaining representatives of certain of GD's employees. Plaintiffs claim that certain provisions of the applicable collective bargaining agreements between GD and the unions, those which provide for an "agency shop," are violative of Tex.Rev.Civ.Stat.Ann. arts. 5154a §§ 8,[1]

1. Tex.Rev.Civ.Stat.Ann. art. 5154a § 8, entitled "Advance fees," provides in pertinent part:

It shall be unlawful for any labor organizer, union official or officer, or member of a labor union, or their agents, to collect any fees, dues, or sum of money whatsoever, in respect to membership in a labor union, or for the privilege to work or as a permit to work, from any person, without giving such person at that time a receipt therefor . . . reciting that such sum of money so received is to be delivered to the labor union, and be

held intact until said person has been duly elected, and has become a bona fide voting member of said labor union. Provided that it shall be unlawful for any labor organizer, union official or officer, or member of a labor union, or their agents to collect any fee for the privilege to work or as a permit to work and no charge shall ever be made nor shall any fee ever be collected for the privilege to work in this State. Provided, however, this shall not prevent the collection of reasonable initiation fees as provided in this Act. . .

8a,[2] & 11 [3] and 5207a,[4] and of Tex.Bus. & Comm.Code Ann. § 15.03(a)(4).[5]

The collective bargaining agreements under attack are executed and administered pursuant to National Labor Relations Board certifications between GD and Defendant unions—International Association of Machinists and Aerospace Workers, AFL–CIO [hereinafter "International Union"], International Association of Machinists and Aerospace Workers, District Lodge 776 [hereinafter "Lodge 776"], and Office and Professional Employees International Union, Local 277 [hereinafter "Local 277"]—which are the exclusive collective bargaining agents for GD employees pursuant to § 9 of the Labor Management Relations Act, 29 U.S.C. § 159.

2. Tex.Rev.Civ.Stat.Ann. art. 5154a § 8a, entitled "Collecting fees for privilege to work forbidden," provides:

It shall be unlawful for any labor union, any labor organizer, any officer, any agent or representative or any member of any labor union to collect, receive or demand, directly or indirectly, any fee, assessment, or sum of money whatsoever, as a work permit or as a condition for the privilege to work from any person not a member of the union; provided, however, this shall not prevent the collection of initiation fees as above stated.

3. Tex.Rev.Civ.Stat.Ann. art. 5154a § 11, entitled "Penalties," provides:

If any labor union violates any provision of this Act, it shall be penalized civilly in a sum not exceeding One Thousand Dollars ($1,000) for each such violation, the sum recovered as a penalty in a Court of competent jurisdiction, in the name of the State, acting through an enforcement officer herein authorized. Any officer of a labor union and any labor organizer who violates any provision of this Act shall be deemed guilty of a misdemeanor, and upon conviction thereof in a Court of competent jurisdiction, shall be punished by a fine not to exceed Five Hundred Dollars ($500) or by confinement in the county jail not to exceed sixty (60) days, or by both such fine and imprisonment.

4. Tex.Rev.Civ.Stat.Ann. art. 5207a, entitled "Right to bargain freely not to be denied; membership in labor union," provides in pertinent part:

\*    \*    \*    \*    \*    \*

Plaintiffs refuse to comply with the bargaining agreements in their entirety. By this lawsuit, they seek an injunction against enforcement of the "agency shop" requirement and unspecified damages.

This action was removed from state court to this Court on 27 March 1973, a few days prior to its trial setting in state court, upon the filing of Plaintiff's "First Amended Original Petition." In October 1975, all parties agreed that this case should be decided on cross motions for summary judgment and that the case should be submitted to the Court entirely on briefs, without oral argument. Since that date, and through December 1976, the parties have submitted their motions for summary judgment and numerous extensive memoranda of law concerning the motions.[6]

Sec. 2. No person shall be denied employment on account of membership or nonmembership in a labor union.

Sec. 3. Any contract which requires or prescribes that employees or applicants for employment in order to work for an employer shall or shall not be or remain members of a labor union, shall be null and void and against public policy. The provisions of this Section shall not apply to any contract or contracts heretofore executed but shall apply to any renewal or extension of any existing contract and to any new agreement or contract executed after the effective date of this Act.

\*    \*    \*    \*    \*    \*

5. Tex.Bus. & Comm.Code Ann. § 15.03(a)(4) states that it is a conspiracy in restraint of trade for an employer and labor union to agree to deny a person the right to work "because of membership or nonmembership in the labor union," or to make such "membership or nonmembership . . . a condition of obtaining or keeping a job."

6. These documents are: "Stipulations" by all parties (filed 24 October 1975); Defendant GD's "Motion for Summary Judgment" (filed 24 October 1975) and letter brief in support thereof (filed the same date); Defendant International Union's "Motion for Summary Judgment" (filed 29 October 1975) and "Memorandum" in support thereof (filed the same date); "Motion for Summary Judgment" of Defendants Lodge 776 and Local 277 (filed 31 October 1975); Plaintiffs' "Motion for Summary Judgment" (filed 31 October 1975) and "Brief" of Defendants Lodge 776 and Local 277 (filed 7 November 1975); "Reply Brief" of Defendant GD (filed 17 November 1975); "Response" of Defendants Lodge 776 and Local 277 (filed 17

# I

## FACTS

By document dated 23 October 1975, all parties have agreed to stipulate the following facts:[7]

1. By Warranty Deed dated September 10, 1941, the City of Fort Worth conveyed 967.121 acres of land in Tarrant County, Texas, to the United States of America. Such Deed was duly recorded in . . . the Deed Records of Tarrant County, Texas . . ..

2. By Warranty Deed dated September 24, 1941, the City of Fort Worth conveyed 435.954 gross acres, being 428.-36 net acres, in Tarrant County, Texas, to the United States of America. Such Deed is duly recorded in . . . the Deed Records of Tarrant County, Texas.
. . .

3. By letter dated December 14, 1942, the Secretary of War of the United States of America requested that the Governor of the State of Texas execute the necessary instruments to place the acreage described in the Deeds designated in Paragraphs 1. and 2. above completely under the control and jurisdiction of the Federal Government.

4. The State of Texas executed a deed of cession dated December 30, 1942, to the United States of America. This deed described two tracts of land in Tarrant County, Texas. Tract I covered 967.121 acres, being the same 967.121 acres described in the Deed referred to in paragraph 1. above. Tract II covered 435.954 gross acres, 428.36 net acres, being the same 428.36 acres described in the Deed

referred to in Paragraph 2. above. . .

5. By letter dated January 18, 1943, the Secretary of War of the United States of America notified the Governor of the State of Texas that the War Department acknowledged receipt of the deed of cession dated December 30, 1942, executed by the Governor on behalf of the State of Texas, ceding exclusive jurisdiction to the United States of America over the 1403.075 acres of land described in said deed of cession and noted the land was being used for military purposes. The letter further stated that the United States of America accepted cession of jurisdiction effective as of January 30, 1943, at 12:00 noon. The original of the letter of acceptance was received in the office of the Governor and duly receipted for by the Governor of the State of Texas of January 27, 1973. . . .

6. . . . [A] map of Air Force Plant # 4, Texas Military Reservation, dated September 24, 1952, prepared by the Department of the Army, Office of the District Engineer, Fort Worth, Texas, being further identified by reference to Project No. 3188[,] . . . accurately reflects the real estate comprising Air Force Plant # 4, including the 428.36 net acres described as Tract II in the deed of cession dated December 30, 1942, referred to in Paragraph 4, above.

7. . . . [A] map designated "Ownership Legend—Air Force Plant # 4," prepared by the Industrial Facilities Department of General Dynamics Corporation on March 11, 1974[,] . . . accurately reflects by the pink colored

November 1975); Defendant International Union's "Opposition" (filed 17 November 1975); supplemental letter brief of Defendants Lodge 776 and Local 277 (filed 9 July 1976); Plaintiffs' "Brief in Opposition and in Reply" (filed 13 July 1976); Defendant GD's "Supplemental Reply Brief" (filed 20 July 1976); "Supplemental Reply Brief" of Defendants Lodge 776 and Local 277 (filed 27 July 1976); Defendant International Union's "Response" (filed 27 July 1976); Plaintiffs' "Supplemental Reply Brief" filed 2 September 1976); and supplemental letter brief of Defendants Lodge 776 and Local 277 (filed 27 December 1976).

The Court would like to take this opportunity to note the general level of excellence of all memoranda submitted. The parties have cited the Court to only the more relevant cases, and have provided logical argument and excellent legislative history to support their views. The Court has not been burdened with string cites to marginally relevant cases, as is the normal situation where lengthy briefing is involved.

7. References to attachments have been omitted.

area those portions of Air Force Plant # 4 covered by deeds of cession from the State of Texas to the United States of America, and owned in fee by the United States of America. The blue colored area reflects land owned by the United States of America in fee, but which is not covered by a deed of cession from the State of Texas. The green portion of the map reflects acreage leased by the United States of America. No deed of cession from the State of Texas covers the green area. The pink portion of the map reflects 434.87 acres of which 428.36 acres are covered by the deed of cession dated December 30, 1942, referred to in Paragraph 4. above, and the remaining 6.51 acres consist of three small tracts covered by a deed of cession dated November 7, 1951, from the State of Texas to the United States of America. Said three small tracts totaling 6.51 acres are designated as Tract Nos. 2, 4 and 9 on the Department of Army map of Air Force Plant # 4 dated September 24, 1952, . . . referred to in Paragraph 6. above. The . . . "Ownership Legend—Air Force Plant # 4" prepared by Industrial Facilities of General Dynamics Corporation dated March 11, 1964, accurately sets forth the location of the buildings, physical structures and facilities located on Air Force Plant # 4 and located on the immediately adjoining area to the East thereof in Craswell Air Force Base. (Plaintiffs, by agreeing to these stipulations do not in any way stipulate, agree or admit that the area colored in pink in the . . . map reflecting "Ownership Legend—Air Force Plant # 4" prepared by the Industrial Facilities Department of General Dynamics Corporation, dated March 11, 1974, is a "Federal Enclave" as is reflected by such legend.)

8. General Dynamics Corporation is a corporation duly incorporated under the laws of the State of Delaware, with its corporate headquarters in the City of Clayton, Missouri.

9. Since September 18, 1972, and for many years prior thereto, Defendant General Dynamics has been in possession of Air Force Plant # 4 by virtue of Facilities Agreements between Defendant General Dynamics and the United States of America.

10. Approximately 138.99 acres of land upon which Air Force Plant # 4 is located are not within a Federal Enclave.

11. As of October 12, 1972, approximately 225 employees of Defendant General Dynamics at Air Force Plant # 4 were permanently assigned to a non-Federal Enclave area.

12. None of the Plaintiffs and none of the employees in the bargaining units live in Air Force Plant # 4.

13. Defendant General Dynamics entered into an Agreement effective September 18, 1972, with Defendant International Union and Defendant Lodge 776. Said agreement covered the production and maintenance unit of the Fort Worth Operation as defined therein and contained the following provision:

"ARTICLE TWO
SECURITY

" . . .

"Section 2. Each employe in the bargaining unit shall, beginning on the 31st day following the execution of this Agreement or the 31st day following his employment, rehire, reinstatement, reemployment, recall, transfer or regression into the bargaining unit, as a condition of continued employment in the bargaining unit, execute and deliver to the Company a payroll deduction authorization as provided for in this Article, or pay directly to the Union an amount of money equal to the Union's regular and usual initiation fee and its regular, uniform and usual monthly dues."

Such agreement expired on September 21, 1975. The same parties, by an agreement effective September 22, 1975, and extending until October 29, 1978, continued in effect the same Section Two as set forth next above.

Defendant General Dynamics and Defendant Local 277 executed an Agreement effective September 18, 1972, ex-

tending until September 21, 1975, and containing the same Section Two as set forth next above. The Agreement covered a unit of the Fort Worth Operation defined therein. Effective September 22, 1975, Defendant General Dynamics and Defendant Local 277 entered into an agreement containing the same Section Two. This Agreement provides that it will extend until October 29, 1978.

14. The respective offices of the Defendant Unions are not located within Air Force Plant # 4. Their respective offices and the properties upon which said offices are located are not owned by the United States of America.

In more detail, the relevant portions of Article Two of the collective bargaining agreement which Plaintiffs attack are:

Section 1. Membership in the Union is not compulsory. Employes have the right to join, not join, maintain, or drop their membership in the Union as they see fit. Neither party shall exert any pressure on or discriminate against an employe as regards such matters.

Section 2. Each employe in the bargaining unit shall, . . . as a condition of continued employment in the bargaining unit, execute and deliver to the Company a payroll deduction authorization as provided for in this Article, or pay directly to the Union an amount of money equal to the Union's regular and usual initiation fee and its regular, uniform and usual monthly dues. . . .

Section 5. . . . Upon written demand from the Union, the Company shall terminate any employe within the bargaining unit who fails to tender the sum due the Union under Section 2 of this Article within thirty (30) days from the date such sum is due provided the Union informs the Company and the employe in writing and allows him an additional fifteen (15) days after the 30th day of delinquency. If the employe fails to resolve his dues delinquency with the Union during this fifteen (15) day period and after notification to the Company by the Union, the Company will terminate the employe effective the end of that payroll period.

Further, by the uncontradicted 24 October 1975 affidavit of Richard B. Craig, who for seven years was the Manager of Employe Relations for the Fort Worth, Texas, operation of General Dynamics Corporation, Defendant GD has established:

"The permanent records of General Dynamics show, and it is a fact, that:

"Only three of the Plaintiffs in the above action are employed by General Dynamics at this time. These are D. G. Haynie, John H. Hauser and H. T. Winn. Plaintiff Haynie is currently employed on a hourly basis in a unit represented by Defendant Local 277. Plaintiffs Hauser and Winn are now working in a salaried position and are not represented by any union. The remaining Plaintiffs have heretofore been laid off and do not have any recall rights.

"The job site of all work done by any of the Plaintiffs while employed by General Dynamics was performed on land covered by a deed of cession dated December 30, 1942, in which the State of Texas ceded exclusive jurisdiction to the United States of America over the land described therein. (Said deed of cession will hereafter be referred to simply as "deed of cession" or "said deed of cession") All of said Plaintiffs reported to work at such job site and received their job instructions there.

"All of the Plaintiffs, and all other employees of General Dynamics, were hired by General Dynamics on land covered by the deed of cession. At all times in question, including September 18, 1972, until today, for all work which any of the Plaintiffs performed for General Dynamics, they received payment of their wages by General Dynamics on land covered by said deed of cession. The checks paid to each of the Plaintiffs were prepared, and then delivered to the Plaintiffs, on the land covered by said deed of cession. All deductions of any type made from their wages were made on land covered by said deed of cession. Where duly authorized,

deductions for union dues were made there also, and when the total amounts due each union in question were thus determined, then General Dynamics prepared, on land covered by said deed of cession a check payable to said unions. General Dynamics then notified a union representative who picked up the check on land covered by said deed of cession. "All of the personnel records pertaining to all of the Plaintiffs, all of the computer systems utilized in operating Air Force Plant # 4, the medical facility available for the employees' use, the restaurant available for their use, the place where their personnel problems were handled, including but not limited to, the filing and handling of grievances, were all on the land covered by the deed of cession. Also, all layoffs, terminations, recall or rehire of General Dynamics employees at Air Force Plant # 4 occur on land covered by said deed of cession.

"The United States of America owns Air Force Plant # 4 and Carswell Air Force Base which adjoins Air Force Plant # 4 on the East, and the United States of America also owns all the buildings, facilities, physical structures, and most of the personal property thereon. General Dynamics' possession of Air Force Plant # 4 is solely at the sufferance of the United States of America in accordance with Facilities Agreements between General Dynamics and the United States of America.

"At all times in question, including September 18, 1972, to date, General Dynamics has developed and built military aircraft for the United States of America and its Allies at said Air Force Plant # 4.

"None of the Plaintiffs or other employees hired by General Dynamics at its Fort Worth operation were, or are, hired by or through any hiring hall arrangement of any type maintained by any union.

"At all times since September 18, 1972, the operation of the Fort Worth Division of General Dynamics has been at Air Force Plant # 4, and all the headquarters and administrative offices of said Fort Worth Division are located on land covered by the deed of cession.

"At all times in question, including September 18, 1972, until today, 97.93% or more of the employees of General Dynamics have and are working on land covered by the deed of cession, and 95% or more of the facilities and building space of Air Force Plant # 4 are located on land covered by said deed of cession. "On October 12, 1972, there were 10,890 persons employed by General Dynamics at Air Force Plant # 4. (Of these, 4,402 were in the unit represented by Defendant International Union and Defendant Lodge 776, and 834 thereof were in the unit represented by Defendant Local 277.) On October 22, 1975, 7,300 persons were employed by General Dynamics at Air Force Plant # 4, and of these, 1,849 were in the unit represented by Defendant International Union and Defendant Lodge 776, and 612 thereof were in the unit represented by Defendant Local 277.

"On October 12, 1972, less than 226 employees out of the total of 10,890 were assigned to work on land not covered by said deed of cession. On October 22, 1975, only 62 employees out of the total of 7,300 were assigned to work on land not covered by said deed of cession.

"All of the land on which Air Force Plant # 4 is located is owned in fee by the United States of America except a portion thereof which is leased by the United States of America from the City of Fort Worth. Of course, at the expiration of said lease, the land covered thereby will revert to the lessor, the City of Fort Worth.

"The map designated "Ownership Legend—Air Force Plant # 4" prepared by the Industrial Facilities Department of General Dynamics Corporation on March 11, 1974, is the same map which was introduced as the Joint Exhibit 1 for all parties in the case of *Howard Cooper, Et Al. v. General Dynamics Et Al.*, Civil Action No. 4–2157 in the United States District Court for the Northern District of Texas, Fort Worth Division.

"All the Agreements between General Dynamics and the Defendant Unions referred to in this action pertain to the Fort Worth Division of General Dynamics Corporation."

## II

### PRELIMINARY DISCUSSION

A lawsuit similar to the present one has already been decided in this District. In *Cooper v. General Dynamics*, 378 F.Supp. 1258 (N.D.Tex.1974), *rev'd and remanded on other grounds*, 533 F.2d 163 (5th Cir. 1976), a different group of plaintiffs asserted, against these same defendants, that collective bargaining agreements similar to the ones now in question were violative of the Texas "right-to-work" laws and that the agreements discriminated against the plaintiffs because of the plaintiffs' religious beliefs. Judge Robert M. Hill, sitting for this Court, held against the plaintiffs on both counts. 378 F.Supp. at 1260–1261.

On appeal, the plaintiffs in *Cooper* acquiesced to Judge Hill's decision on the question of the application of the Texas "right-to-work" laws in a federal enclave in Texas. As stated by the appellate court:

. . . [T]he effect of the Texas Right-to-Work law on the controversy . . . is not before us because appellants have not challenged on appeal the district court determination that state law lacked force on the federal enclave.

533 F.2d 163. The appellate court accordingly assumed the validity of Judge Hill's decision on the question of the Texas "right-to-work" laws in discussing the remaining issues of religious discrimination.

■ Normally, a decision so exactly in point by the same District Court would act as *stare decisis* on the present controversy. But the cause of action now before the Court stands in an unusual procedural posture.

The present case was pending on the docket of this Court prior to trial in the *Cooper* case. Plaintiffs in this case moved to consolidate this action with the *Cooper* case, a move opposed by all other parties.

This Court, Judge Leo Brewster presiding, denied consolidation.

Plaintiffs now urge that the *Cooper* case was primarily a religious discrimination case; that the question of the applicability of the state "right-to-work" laws was thrown in as an afterthought and not properly argued; and that the question of the applicability of the Federal Assimilative Crimes Act was never decided in the *Cooper* case. In short, Plaintiffs urge a re-examination of the *Cooper* decision.

Under traditional notions of judicial fairness, because this Court denied consolidation with the *Cooper* case, the Court must now carefully re-examine Plaintiff's arguments and not simply apply the *Cooper* decision as *stare decisis*.

## III

### APPLICABILITY OF STATE LAWS ON A FEDERAL ENCLAVE

The Constitution of the United States provides in Art. I, § 8, cl. 17, that the United States Congress is to "exercise exclusive legislation" over federal enclaves ceded by the state to the federal government. The Supreme Court has long upheld the right of the federal government to exclusive control of federal enclaves. In *Surplus Trading Co. v. Cook*, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930), the Supreme Court surveyed previous holdings on the exclusivity of federal control over federal enclaves, 281 U.S. at 652–656, 50 S.Ct. 455, and stated:

"Exclusive legislation" is consistent only with exclusive jurisdiction. It can have no other meaning as to the seat of government. . . . That no divided jurisdiction respecting the seat of government is intended is not only shown by the terms employed but is a matter of public history. Why . . . is the power given made to depend on purchase with the consent of the legislature of the state, if the jurisdiction of the United States is not to be exclusive and that of the state excluded?

281 U.S. at 652, 50 S.Ct. at 456. This doctrine has been most recently reaffirmed in *United States v. State Tax Commission of Mississippi*, 412 U.S. 363, 93 S.Ct. 2183, 37 L.Ed.2d 1 (1973) [hereinafter *"Mississippi Tax Commission"*].

■ Thus, the voluntary cession of land by a state to the federal government involves an actual transfer of sovereignty. Accordingly, the applicable law is that of the new sovereign, plus any law of the old sovereign *as it stood at the time of cession* that is necessary to fill "gaps" in the new sovereign's law, provided such old laws do not conflict with the laws of the new sovereign. This is the rule that the Supreme Court has applied in determining the law applicable to federal enclaves.

In *Pacific Coast Dairy, Inc. v. Department of Agriculture of California*, 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 761 (1943), recently reaffirmed in *Mississippi Tax Commission, supra*, 412 U.S. at 369–371, 93 S.Ct. 2183, the Supreme Court stated:

> The exclusive character of the jurisdiction of the United States on [the federal enclave] is conceded. . . .
>
> When the federal government acquired the tract, local law not inconsistent with federal policy remained in force until altered by national legislation. The state statute involved was adopted long after the transfer of sovereignty and was without force in the enclave. . . . As respects such federal territory Congress has the combined powers of a general and a state government.

318 U.S. at 294, 63 S.Ct. at 630 (footnotes omitted).

The reasons behind this approach to federal jurisdiction were set forth in *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 60 S.Ct. 431, 84 L.Ed. 596 (1940), also recently reaffirmed in *Mississippi Tax Commission, supra*, 412 U.S. at 370 n. 12, 93 S.Ct. 2183.

> . . . The Constitution does not command that every vestige of the laws of the former sovereign must vanish. On the contrary its language has long been interpreted so as to permit the continuance until abrogated of those rules existing at the time of the surrender of sovereignty which govern the rights of the occupants of the territory transferred. This assures that no area however small will be left without a developed legal system . . . . [Past] holdings assimilate the laws of the federal territory, where the Congress has not legislated otherwise, to the laws of the surrounding state.
>
> . . . Since only the law in effect at the time of the transfer of jurisdiction continues in force, future statutes of the state are not a part of the body of laws in the ceded area. Congressional action is necessary to keep it current.

309 U.S. at 99–100, 60 S.Ct. at 433–434 (footnotes omitted). *See also Howard v. Commissioners of Sinking Fund of City of Louisville*, 344 U.S. 624, 626–629, 73 S.Ct. 465, 97 L.Ed. 617 (1953); *Murray v. Joe Gerrick & Co.*, 291 U.S. 315, 318, 54 S.Ct. 432, 78 L.Ed. 821 (1934); *Chicago, R.I. & P. RR. v. McGlinn*, 114 U.S. 542, 546–547, 5 S.Ct. 1005, 29 L.Ed. 270 (1885).

## IV

## STATUS OF AIR FORCE PLANT # 4 AS A FEDERAL ENCLAVE

■ According to the stipulated facts, cession of 428.36 acres of Air Force Plant # 4 was perfected on 30 January 1943. Cession of another 6.51 acres was deeded on 7 November 1951.[8] There are 138.99 acres of Air Force Plant # 4 that are not located within a federal enclave.[9] A state court

---

**8.** There is no evidence in the record as to when, if ever, such cession was accepted by the United States government. *See DeKalb County v. Henry C. Beck Co.*, 382 F.2d 992, 995–996 (5th Cir. 1967).

**9.** Congress has power to exercise jurisdiction over federal enclaves under Art. I, § 8, cl.

17 of the Constitution. The federal government may, without the consent of the state, acquire land within a state by condemnation or purchase. But without state consent the United States does not obtain the benefits of Art. I, § 8, cl. 17, and its possession is that of an ordinary proprietor. . . .

has previously determined that the 428.36 acres of land ceded to the United States and accepted on 30 January 1943, constituted a valid federal enclave. *Board of Equalization of City and Ind. Sch. Dist. of Fort Worth v. General Dynamics Corp.*, 344 S.W.2d 489 (Tex.Civ.App.—Fort Worth 1961, writ ref'd n. r. e.).[10]

## V

## APPLICABILITY OF STATE "RIGHT-TO-WORK" LAWS TO AIR FORCE PLANT # 4

Tex.Rev.Civ.Stat.Ann. art. 5154a [hereinafter "Article 5154a"] was enacted in 1943. Tex.Rev.Civ.Stat.Ann. art. 5207a [hereinafter "Article 5207a"] was enacted in 1947. Tex.Bus. & Comm.Code Ann. § 15.03(a)(4) [hereinafter "§ 15.03(a)(4)"] was enacted in 1967. Under Tex.Const. art. 3, § 39, laws enacted by the Texas legislature become effective ninety days after adjournment of the session at which it was enacted. Article 5154a became effective on 10 August 1943; Article 5207a became effective on 4 September 1947; and § 15.03(a)(4) became effective on 28 August 1967.[11]

Thus, none of the Texas statutes relied on by Plaintiffs were in effect at the time cession of the 428.36 acres was perfected; Articles 5154a and 5207a were in effect at the time cession of the 6.51 acres was perfected;[12] and all the statutes relied on by Plaintiffs could arguably apply to the 138.-99 acres of Air Force Plant # 4 not located within a federal enclave.

Prior to enactment of Articles 5154a & 5207a, Texas Courts had expressly decreed that collective bargaining contracts establishing union security arrangements were not void as against public policy. *International Assoc'n of Machinists v. Sandsberry*, 277 S.W.2d 776, 780 (Tex.Civ.App.—Amarillo 1954), *aff'd*, 156 Tex. 340, 295 S.W.2d 412 (1956); *Texas State Federation of Labor v. Brown & Root, Inc.*, 246 S.W.2d 938, 942 (Tex.Civ.App.—Austin 1952, writ ref'd n. r. e.). *See also* Article 5207a § 3, set forth in note 4 *supra*. Since the enactment of Article 5207a, there can be no doubt that "agency shops" such as the one here in question are prohibited by Texas law. *Mobil Oil Corp. v. Oil, Chemical & Atomic Workers, I.U., AFL–CIO*, 81 L.R.R.M. 2051, 2053 (E.D.Tex.1972), *aff'd*, 504 F.2d 272, 275 n. 6 (5th Cir. 1974), *rev'd on other grounds*, 426 U.S. 407, 410 n. 4, 96 S.Ct. 2140, 2143 n. 4, 48 L.Ed.2d 736 (1976); Tex.Atty.Gen.Op. No. WW–1018 (1961).[13]

■ Hence, the Texas "right-to-work" laws are clearly not a part of the civil law of the 428.36 acres of Air Force Plant # 4 that constitute a federal enclave; they are arguably a part of the applicable law on the remaining 145.50 acres.[14]

It has been established by uncontroverted affidavit that the job site for all work done by any of Plaintiffs while employed by Defendant GD was performed on the area that constitutes a federal enclave. Defendants urge the Court to dispose of the case entirely on this ground. But the argument remains that, since the collective bargaining contract covered the entire facilities, part

---

*DeKalb County v. Henry C. Beck Co.*, 382 F.2d 992, 994 (5th Cir. 1967) (footnote and citation omitted).

**10.** It is apparent that only the land involved in the 1943 cession, and not that involved in the 1951 cession or that later purchased or rented by the United States, was in issue in this case. 344 S.W.2d at 489–491.

**11.** Tex.Rev.Civ.Stat.Ann., *Tables*, at 492 & 507 (1958) & 105 (Supp.1976).

**12.** For the sake of argument, the Court is here assuming perfection of the cession of the 6.51 acres. *See* note 8 *supra*. With regard to the ultimate outcome of this case, it does not mat-

ter whether these 6.51 acres are treated as a federal enclave or as land owned in fee by the United States.

**13.** Defendant GD has conceded the accuracy of Tex.Atty.Gen. No. WW–1018 with regard to Article 5207a in its 17 November 1975 "Reply Brief."

**14.** This 145.50 acres includes the 138.99 acres that are not located within a federal enclave, and the 6.51 acres that arguably became a federal enclave in 1951. *See* note 12 *supra*.

of which were located in a federal enclave and part of which were not, the contractual clause in question might be entirely void.

With regard to this question, the Court is guided by the Supreme Court's recent decision in *Oil, Chemical and Atomic Workers, I.U., AFL–CIO v. Mobil Oil Corp.*, 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976). In that case, the employer and unions had entered into an "agency shop" agreement covering seamen employed on the high seas, but also having significant contacts with the State of Texas. The question before the Court in the *Mobil Oil* case was whether Texas's "right-to-work" laws applied and prohibited the collective bargaining agreement in question. Justice Marshall rendered the five-Justice majority opinion.

. . . § 8(a)(3) of the Taft–Hartley Act . . . makes employment discrimination in favor of or against labor unions an unfair labor practice but contains the following proviso which we have held to apply to agency shops as well as union shops, *NLRB v. General Motors Corp.*, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963):

> "Provided, that nothing in this subchapter or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later. . . ."

\*    \*    \*    \*    \*    \*

While § 8(a)(3) articulates a national policy that certain union security agreements are valid as a matter of federal law,[15] § 14(b) reflects Congress' decision that any State or Territory that wishes to may exempt itself from that policy. Section 14(b) allows a State or Territory to ban agreements "requiring membership in a labor organization as a condition of employment." We have recognized that with respect to those state laws which § 14(b) permits to be exempted from § 8(a)(3)'s national policy "[t]here is . . . conflict between state and federal law; but it is a conflict sanctioned by Congress with directions to give the right of way to state laws . . . ." *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963). The question here of course is whether Texas' contacts with this employment relationship are adequate to call into play § 14(b)'s mandated deference to state law.

Section 14(b) simply mirrors that part of § 8(a)(3) which focuses on post-hiring conditions of employment. . . . It is evident, then, that § 14(b)'s primary concern is with state regulation of the post-hiring employer-employee-union relationship. And the center of the post-hiring relationship is the job situs, the place where the work that is the vary *raison d'etre* of the relationship is performed.

The centrality of job situs to Congress' concern in § 14(b) is also suggested by the House Committee Report on the bill that contained the substance of what was finally enacted as § 14(b). . . .

Whether taken separately or together, the place of hiring and the other factors on which respondent relies—the employees' place of residence, the locale of personnel records, the place at which payroll checks are written, etc.—are not nearly as central to the concerns of § 14(b) as the employees' job situs. And, because of this close relationship between § 14(b)

---

**15.** Although Justice Stevens joined in the majority opinion, he filed a separate concurring opinion stating that he did not join in the "suggestion that federal policy favors permitting union-shop and agency-shop agreements." 426 U.S. at 421, 96 S.Ct. at 2148. The statement of federal labor policy contained in Justice Marshall's opinion nevertheless reflects a majority decision, since approval of a federal labor policy is necessarily inherent in Justice Powell's concurring opinion—426 U.S. at 421 – 422, 96 S.Ct. at 2148—which adopts the dissenting opinion of five judges of the Fifth Circuit Court of Appeals. *See Mobil Oil, supra,* 504 F.2d at 285–286 (dissenting opinion).

and job situs we conclude that § 14(b) does not allow enforcement of right-to-work laws with regard to an employment relationship whose principal job situs is outside of a State having such laws.

Two practical considerations bolster our conclusion that the employees' predominant job situs should determine the applicability of a State's right-to-work laws under § 14(b). First, the use of a job situs test will minimize the possibility of patently anomalous extra-territorial applications of any given State's right-to-work laws. . . .

A test such as the one adopted by the Court of Appeals that evaluates all of a jurisdiction's employment relationship contacts in order to determine the applicability of its right-to-work laws under § 14(b) might not result in irrational extra-territorial applications. But such a test does suffer the disadvantages of being both less predictable and more difficult of application than a job situs test. Under a job situs test, parties entering a collective-bargaining agreement will easily be able to determine in virtually all situations whether a union- or agency-shop provision is valid. By contrast, bargaining parties would often be left in a state of considerable uncertainty if they were forced to identify and evaluate all the relevant contacts of a jurisdiction in order to determine the potential validity of a proposed union security provision. The unpredictability that such a test would inject into the bargaining relationship, as well as the burdens of litigation that would result from it, make us unwilling to impute to Congress any intent to adopt such a test.

. . . Because most of the employees' work is done on the high seas, outside the territorial bounds of the State of Texas. Texas' right-to-work laws cannot

govern the validity of the agency-shop provision at issue here. It is immaterial that Texas may have more contacts than any other State with the employment relationship in this case, since there is no reason to conclude under § 14(b) that in every employment situation *some* State or Territory's law with respect to union security agreements must be applicable. Federal policy favors permitting such agreements unless a State or Territory with a sufficient interest in the relationship expresses a contrary policy via right-to-work laws. It is therefore fully consistent with national labor policy to conclude, if the predominant job situs is outside the boundary of any State, that no State has a sufficient interest in the employment relationship and that no State's right-to-work laws can apply.

426 U.S. at 414 – 421, 96 S.Ct. at 2144 – 2147 (footnotes omitted).

Of course, a federal enclave is in a different physical and legal relationship to a state than are the high seas, since the enclave is completely surrounded by a state and adopts some of the state's laws, while the high seas merely border different states and are traditionally controlled by distinct areas of federal law.[16] Nevertheless, the Court can see no way to differentiate federal enclaves from the high seas under the logic expounded in the *Mobil Oil* majority opinion.[17] As previously discussed, a federal enclave is under federal, not state, jurisdiction, and the applicable law is federal law.

The facts of the present case, however, push this Court a step beyond the Supreme Court's reasoning in *Mobil Oil.* Stipulations have established that, at the time this lawsuit was filed, part of the Air Force Plant # 4 was within a federal enclave, and part was not. 428.36 acres of land (74.65% of the total acreage) is located on a federal en-

---

16. *See Mobil Oil, supra*, 426 U.S. at 421 – 422, 96 S.Ct. at 2148 (concurring opinion of Justice Powell).

17. The majority opinion in *Mobil Oil* is, indeed, a true majority opinion, since Justice Powell's concurrence affirms that aspect of the majority

opinion relating to federal labor policy, and Justice Steven's concurrence affirms that aspect relating to use of job sites as the determining choice-of-law rule. 426 U.S. at 421 – 422, 96 S.Ct. at 2148. *See* note 15 *supra*.

clave where the Texas "right-to-work" laws do not apply; 6.51 acres (1.13%) is located on a federal enclave where the Texas "right-to-work" laws arguably might apply; and 138.99 acres (24.22%) are not within a federal enclave. At least 95% of the facilities and building space of Air Force Plant # 4 are located on the federal enclave where Texas's "right-to-work" laws do not apply. On 12 October 1972, there were 10,890 persons employed by Defendant GD. Of these 225 employees (2.07% of the total employees) were assigned to work on land outside the federal enclaves; the remainder (97.93%) were assigned to work on the federal enclave where Texas's "right-to-work" laws do not apply.[18]

■ From the facts before the Court, Air Force Plant # 4 appears to constitute one job situs; it is not practically divisible along federal-state boundary lines into different labor-force areas. Thus the Court is faced with a choice of labor law in a situation where one job situs is partially under federal jurisdiction and partially under state jurisdiction.

Relying on the Supreme Court's statement of federal labor policy in *Mobil Oil*,[19] and on the insistence of the majority therein in formulating a practical and predictable test for the sake of certainty in bargaining procedure,[20] the Court is of the opinion the law of the federal enclave whereon the vast majority of employees work and the vast majority of facilities and building space are located should control the entire contract. The Federal labor policy in favor of allowing union-security agreements is at least equal to the policy of the State of Texas in enforcing its "right-to-work" laws. And to require the parties to a collective bargaining agreement to formulate two different contracts where the job situs is not practically divisible along federal-state boundary lines into different labor-force areas would violate the policy of practicality that governs interpretation of the federal labor laws.

Accordingly, under the particular facts of this case, which establish that the vast majority of the actual work situs is on a federal enclave established prior to passage of the Texas "right-to-work" laws, the Court holds that Texas's "right-to-work" laws are not applicable to the collective bargaining agreement in question.[21]

## VI

## APPLICATION OF THE FEDERAL ASSIMILATIVE CRIMES ACT

Plaintiffs' final argument is that the Federal Assimilative Crimes Act, 18 U.S.C. § 13, adopts Texas law that makes union security agreements illegal. Plaintiffs reason, therefore, that the collective bargaining agreement in question is void as a contract to accomplish an illegal object, or as one against public policy.[22] The Court is of the opinion that Plaintiffs' argument is erroneous for several reasons.

By its very language, 18 U.S.C. § 13 assimilates the criminal laws of the area in

---

**18.** By construing together the 23 October 1975 "Stipulations" and the uncontradicted 24 October 1975 affidavit of Richard B. Craig, both set out in relevant part *supra*, it appears that there are no workers assigned to the 6.51 acres of federal enclave where the Texas "right-to-work" laws arguably might apply.

**19.** 426 U.S. at 414–419, 96 S.Ct. at 2145–2146. *See* notes 15 & 17 *supra*. *See also NLRB v. General Motors Corp.*, 373 U.S. 734, 740–741, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963); *Radio Officers Union v. NLRB*, 347 U.S. 17, 40–41, 74 S.Ct. 323, 98 L.Ed. 455 (1954); *Colgate-Palmolive-Peet Co. v. NLRB*, 338 U.S. 355, 362, 70 S.Ct. 166, 94 L.Ed. 161 (1949).

**20.** 426 U.S. at 419, 96 S.Ct. at 2147.

**21.** The Court would like to reiterate that its holding in this case is not intended to necessarily foreclose a different result where the majority of the actual work situs is on land under state jurisdiction or where the federal-state boundary lines constitute reasonable dividing lines between different substantial segments of the labor force involved.

**22.** *See generally Woolsey v. Panhandle Refining Co.*, 131 Tex. 449, 116 S.W.2d 675 (1938); *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146 (1947). Pre-1943 Texas contract law is, of course, applicable to the federal enclave unless pre-empted by federal policy.

**800**

which a federal enclave is located, regardless of when the area was ceded to the federal government. In relevant part, 18 U.S.C. § 13 states:

> Whoever within or upon any . . . [federal enclave], is guilty of any act or omission which although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State · . . . in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

*See generally United States v. Sharpnack,* 355 U.S. 286, 292–294, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958).

■ The purpose and policy of the Federal Assimilative Crimes Act is the wholesale adoption of local criminal laws to provide a complete set of criminal laws on federal enclaves, in order to fill the gaps in federal criminal law. *Sharpnack, supra,* 355 U.S. at 293–294, 78 S.Ct. 291; *United States v. Prejean,* 494 F.2d 495, 496 (5th Cir. 1974).

■ The courts have traditionally held that assimilative crime acts do not adopt any state penal statutes that are in conflict with federal policy, since such statutes do not serve the purpose of filling any "gaps" in federal criminal law. *Sadrakula, supra,* 309 U.S. at 103–104, 60 S.Ct. 431; *United States v. Warne,* 190 F.Supp. 645, 658–659 (N.D.Cal.1960), *aff'd in part, rev'd & remanded in part on other grounds, sub. nom. Paul v. United States,* 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); *Air Terminal Services, Inc. v. Rentzel,* 81 F.Supp. 611, 612 (E.D.Va.1949). *See Sharpnack, supra,* 355 U.S. at 293 n. 9, 78 S.Ct. 291. *Cf. Johnson v. Yellow Cab Co.,* 321 U.S. 383, 388–390, 64 S.Ct. 622, 88 L.Ed. 814 (1944); *Hunt v. United States,* 278 U.S. 96, 100–101, 49 S.Ct. 38, 73 L.Ed. 200 (1928). Hence, since federal labor policy favors union security agreements,[23] the criminal provisions of the Texas "right-to-work" laws are not incorporated into federal criminal law by 18 U.S.C. § 13. *King v. Gemini Food Services,* 93 LRRM 2921, 2922–2923 (E.D.Va.1976); *Warne, supra,* 190 F.Supp. at 658–659.

Moreover, absent prosecution by the federal government through its United States attorney in a proper criminal case, the Supreme Court has advised that federal courts should abstain from deciding what are essentially issues of federal criminal law. *Johnson, supra,* 321 U.S. at 388–393, 64 S.Ct. 622. *See also People of Puerto Rico v. Shell Co.,* 302 U.S. 253, 266, 58 S.Ct. 167, 82 L.Ed. 235 (1937).

■ Nevertheless, a quick inspection of the substance of the state laws involved reveals that there are no applicable criminal penalties. Article 5207a provides no criminal penalties. Nor is a conspiracy in restraint of trade under § 15.03(a)(4) criminally punishable in the State of Texas; only civil monetary penalties are recoverable. Tex.Bus. & Comm.Code Ann. §§ 15.32 & 15.33. Similarly Article 5154a § 11 provides for only civil penalties against a union violator.

Article 5154a § 11 does provide that any officer or organizer of a labor union who violates that Article is guilty of a misdemeanor. There are, however, two bars to applying this statute. First, no officer or organizer of a labor union is a party to this lawsuit. More importantly, the Court has already determined that the civil aspect of Article 5154a does not apply to the federal enclave here in question. Since the criminal aspect of Article 5154a is simply supportive of the Article's civil policy, the criminal statute would not be incorporated where the civil provisions were not adopted. *See generally Sadrakula, supra,* 309 U.S. 94, 60 S.Ct. 431, 84 L.Ed. 596.

The Court, therefore, has no reason to reach the lengthy, detailed arguments concerning whether Article 5154a by itself makes "agency shop" agreements illegal.[24]

---

**23.** *See* text at, and, notes 15, 17, & 19.

**24.** *See* Op.Tex.Atty.Gen.No. WW–1018 (1961); *Sandsberry, supra,* 277 S.W.2d at 780; *Brown & Root, supra,* 246 S.W.2d at 942; Article

## VII

The Court is therefore of the opinion that Plaintiffs' motion for summary judgment should be denied and that Defendants' motions for summary judgment should be granted. Judgment will be entered accordingly.

5207a § 3; 1943 Tex.House J. 120, 657–662, 708, 837 & 1148; 1943 Tex.Senate J. 464–465, 467, 473–474, & 477; *AFL v. Mann*, 188 S.W.2d 276, 283–286 (Tex.Civ.App.—Austin 1945, no writ); *AFL v. Bain*, 165 Or. 183, 106 P.2d 544 (1940); *Alabama State Federation of Labor v. McAdory*, 246 Ala. 1, 18 So.2d 810 (1944); *Hotel & Restaurant Employees Int'l Alliance v. Greenwood*, 249 Ala. 265, 30 So.2d 696 (1947); *International Ass'n of Machinists v. Florida*, 153 Fla. 672, 15 So.2d 485 (1943); *Van Zandt v. McKee*, 202 F.2d 490 (5th Cir. 1953); *Mobil Oil*, *supra*, 426 U.S. at 427 n. 4 & 428 – 434, 96 S.Ct. at 2143 n. 4 & 2151–2153, and 504 F.2d at 275 n. 6; *Associated General Contractors*, 145 NLRB No. 43, 53 LRRM 1299 (1963), *aff'd, sub. nom. NLRB v. Associated General Contractors*, 349 F.2d 449 (5th Cir. 1965).