**PROFESSIONAL HELICOPTER PILOTS ASSOCIATION, OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL 102 Plaintiff,**

v.

**LEAR SIEGLER SERVICES, INC., Guadalupe Hernandez, and Robert Bernal, Defendants.**

**No. CIV.A. 1:03CV625–A.**

United States District Court, M.D. Alabama, Southern Division.

July 26, 2004.

---

Melvin S. Schwarzwald, Schwarzwald & McNair, Timothy Joseph Gallagher, Schwarzwald & McNair, Cleveland, OH, for Professional Helicopter Pilots Association, Office and Professional Employees International Union, Local 102, Plaintiff.

Elmer E. White, III, The Kullman Firm, Birmingham, AL, Everett McRae Urech, Urech & Livaudais, PC, Daleville, AL, for Lear Siegler Services, Inc., Guadalupe Hernandez, Robert Bernal, Defendants.

## MEMORANDUM OPINION AND ORDER

ALBRITTON, Senior District Judge.

### I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment filed by Profes-

sional Helicopter Pilots Association, Office and Professional Employees International Union, Local 102 ("the Plaintiff" or "the Union" or "Local 102") (Doc. # 17), and a Motion for Summary Judgment filed by Guadalupe Hernandez and Robert Bernal ("the Defendants" or "the employees") (Doc. # 19).

This court invited the United States of America to be heard on the jurisdictional question in this case through a certification to Attorney General John Ashcroft and to Leura Garrett Canary, United States Attorney for the Middle District of Alabama. (Docs.# 22, 23). The Court also invited the State of Alabama to be heard on the jurisdictional question in this case through a certification to Alabama Attorney General Troy King. (Docs.24, 25). The court has not received any response by the deadline provided, or as of the issuance of this opinion, from either the United States of America or the State of Alabama.

For the reasons to be discussed, the Defendants' Motion for Summary Judgment is due to be GRANTED, and the Plaintiff's Motion for Summary Judgment is due to be DENIED, both to the extent set out herein.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In resolving cross-Motions for Summary Judgment, courts construe the facts in the light most favorable to the nonmovant when the parties' factual statements conflict or inferences are required. *Barnes v. Southwest Forest Indus.*, 814

F.2d 607, 609 (11th Cir.1987). In this case, however, the parties have filed a Joint Stipulation of Relevant Facts (Doc. # 16) to be used in determining the critical issues of law in the case. The Defendant Lear Siegler Services, Inc. takes no position on the merits of the case (Answer, Doc. # 7), and all parties agree that the case may be finally resolved on the basis of the stipulated facts, the cross-motions, briefs and exhibits.

### III. *FACTS*

The Joint Stipulation of Relevant Facts filed with this Court indicates the following:

Guadalupe Hernandez and Robert Bernal work at Fort Rucker, Alabama, as employees of Lear Siegler Services, Inc. (LSSI). LSSI provides helicopter instruction and training to the United States Army and North Atlantic Treaty Organization (NATO) personnel. Neither of the two works on the Main Post of Fort Rucker. Hernandez works on Cairns Field; Bernal works on Shell Field.

Effective January 1, 2002, and continuing through September 30, 2005, Local 102 and LSSI are parties to a collective bargaining agreement (CBA) that sets forth the terms and conditions of employment of the members of the Local 102 bargaining unit at Fort Rucker, including Hernandez and Bernal. Local 102's bargaining unit consists of all flight instructors, flight simulator instructors, academic instructors, flight simulator operators, flight schedulers, Method of Instruction personnel, supply personnel, clerical personnel, messenger personnel, and custodial personnel employed by LSSI at Fort Rucker, Alabama.

The CBA contains what is commonly referred to as an "agency shop" provision. This provision requires all members of the Fort Rucker bargaining unit to either become and remain members in good standing of Local 102 or pay to Local 102 an agency fee that equals the dues paid by Local 102 members. As to employees who do not join the Union, Article 3.1(d) of the CBA states:

... Upon written demand from the Union, the Company shall terminate any employee within the bargaining unit who fails to tender the sums due under Section 3.1(b) of this Article within thirty (30) days from the date such sum(s) is due, provided the Union informs the Company and the employee of the delinquency in writing, and allows the employee an additional fifteen (15) days after the 30th day of delinquency to make payment in full. If the employee fails to resolve the dues delinquency with the Union during this fifteen (15) day period, after notification to the Company by the Union, the Company will terminate the employee effective the end of that payroll period.

Hernandez and Bernal have refused the Union's demand that they either join the Union or pay these agency fees. In response to a formal inquiry, LSSI informed the Union that if requested it would not discharge either of these employees because it is unsure about whether the agency shop agreement contained in CBA 3.1(d) violates the Alabama right-to-work statutes. LSSI suggested that Local 102 seek judicial guidance, and this suit for declaratory judgment and injunctive relief followed.

The United States government's jurisdiction over Fort Rucker is largely based on two Land Patents. On September 2, 1952, Alabama Governor Gordon Person ceded jurisdiction to the United States over certain land in what is termed the 1952 Land Patent. This land includes the part of the Main Post where LSSI's opera-

tions are headquartered and where LSSI hires employees. Neither Shell Field, where Bernal works, nor Cairns Field, where Hernandez works, is contained within the 1952 Land Patent. On August 24, 1982, Alabama Governor Fob James ceded land to the United States in what is termed the 1982 Land Patent. Cairns Field was part of the land ceded in 1982. This transfer also included parts of Fort Rucker's Main Post. Shell Field was not included in the 1982 land transfer; the federal government's interest over Shell Field is merely proprietorial.

Members of the Local 102 bargaining unit work on the Main Post, Cairns Field, and Shell Field. There are 417 members of the bargaining unit. One hundred eighty-six or 44.60% of Local 102's bargaining unit perform the majority of their work on land that was ceded in the 1952 Land Patent. One hundred fifty-nine or 38.13% of the Union's bargaining unit perform the majority of their work on land that was ceded in the 1982 Land Patent. Seventy-two or 17.27% of the bargaining unit perform the majority of their work on Shell Field. The United States Army retains the authority to unilaterally change the location of the instruction and training performed by LSSI's Local 102–represented employees within the confines of the Main Post, Cairns Field, and Shell Field. The United States Army used this authority in the late 1990s to move the situs of the flight training portion of the Primary Division Training from Lowe Field, which is located on Main Post, to Cairns Field. Members of the bargaining unit also have the ability to transfer jobs under Article 9 of the CBA, including the right to transfer between areas of Fort Rucker that fall under a different jurisdictional status.

## IV. DISCUSSION

Alabama's right-to-work laws are found at *Ala.Code* (1975), §§ 25–7–30, *et seq.*

They are quoted and discussed later in this opinion.

The central issue before the court in this case is whether the Alabama right-to-work laws are applicable to Hernandez, who works on Cairns Field, and Bernal, who works on Shell Field. In considering this issue, the court endeavors to answer three questions: (1) whether a state right-to-work law is applicable where the state and federal government have concurrent legislative jurisdiction, (2) whether the State of Alabama retained concurrent jurisdiction over Cairns Field in the 1982 land transfer to the United States Government, and (3) whether under the job situs test the Alabama right-to-work laws should apply to Hernandez and Bernal.

### A) The Applicability of a State's Right-to-Work Laws Under Concurrent Jurisdiction with the Federal Government

■ The Constitution provides that "[t]he Congress shall have the power ... [t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.[.]" U.S. CONST. art. I, s. 8, cl. 17. Pursuant to this Constitutional provision, "Congress may acquire derivative legislative power from a State ... by consensual acquisition of land, or by nonconsensual acquisition followed by the State's subsequent cession of legislative authority over the land." *Kleppe v. New Mexico*, 426 U.S. 529, 542, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). This derivative legislative power "may range from exclusive

federal jurisdiction with no residual state police power, to concurrent, or partial, federal legislative jurisdiction, which may allow the State to exercise certain authority." *Id.* The federal government may also simply have a proprietorial interest in the land. *Paul v. U.S.*, 371 U.S. 245, 264, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963) (citing *James v. Dravo Contracting Co.*, 302 U.S. 134, 141–42, 58 S.Ct. 208, 82 L.Ed. 155 (1937)).

Both the Plaintiff and the Defendants in discussing these four different types of authority rely upon Army Regulation 405–20 to explain the varying types of federal jurisdiction over federally owned lands. The court also views this regulation as providing a helpful general description of the nature of exclusive federal jurisdiction, concurrent jurisdiction, partial jurisdiction, and the federal government's proprietorial interest. U.S. Dep't. of Army Reg. 405–20, REAL ESTATE: FEDERAL LEGISLATIVE JURISDICTION (1973) (hereinafter "AR 405–20"); *see also* REPORT OF THE INTERDEPARTMENTAL COMMITTEE FOR THE STUDY OF JURISDICTION OVER FEDERAL AREAS WITHIN THE STATES, Part I, p. 14–22 (1956); Shane D. Cooper, *Chaplains Caught in the Middle: The Military's 'Absolute' Penitent–Clergy Privilege Meets State 'Mandatory' Child Abuse Reporting Laws*, 49 NAVAL L. REV. 128, 146–47 (2002) (citing THE JUDGE ADVOCATES GENERAL'S SCHOOL, UNITED STATES ARMY, JA–221, LAW OF MILITARY INSTALLATIONS DESKBOOK, ch. 2 at 54–60 (1996)); Stephen E. Castlen & Gregory O. Block, *Exclusive Federal Legislative Jurisdiction: Get Rid of It!*, 154 MIL. L. REV. 113, 115–18 (1997); Alan L. Cook, *The Armed Forces as a Model Employer in Child Support Enforcement: A Proposal to Improve Service of Process on Military Members*, 155 MIL. L. REV. 153, 170 n. 111 (1998) (citing U.S. Dep't of Army, Pam. 27–21, LEGAL SERV., ADMIN AND CIVIL LAW HANDBOOK, 16, 17 (1992)); PAMELA BALDWIN,

FEDERAL JURISDICTION AND THE IMPOUNDMENT AND SALE OF CATTLE TRESPASSING ON FEDERAL PUBLIC LANDS at p. 3–4 (2003).

Under AR 405–20, exclusive legislative jurisdiction is defined as follows:

> This term is applied when the Federal Government possesses, by whatever method acquired, all of the authority of the State, and in which the State concerned has not reserved to itself the right to exercise any of the authority concurrently with the United States except the right to serve civil or criminal process in the area relative to activities which occurred outside the area. This term is applicable even though the State may exercise certain authority over the land pursuant to the authority granted by Congress in several federal statutes *permitting* the State to do so. AR 405–20 at 136.

Concurrent legislative jurisdiction exists "in those circumstances wherein, in granting to the United States authority which would otherwise amount to exclusive legislative jurisdiction over an area, the State concerned has reserved to itself the right to exercise, concurrently with the United States, all of the same authority." *Id.*

Partial legislative jurisdiction is applicable "in those circumstances where the Federal Government has been granted, for exercise by it over an area in a State, certain of the State's authority, but where the State concerned has reserved to itself the right to exercise, by itself or concurrently with the United States, other authority constituting more than merely the right to serve civil or criminal process . . . ." *Id.*

As for proprietorial interests only, the "term is applied to those instances wherein the Federal Government has acquired some degree of right or title to an area in

a State, but has not obtained any measure of the State's authority over the area." *Id.*

The parties agree that the federal government has exclusive jurisdiction over the land acquired in the 1952 land transfer, which is composed primarily of the Fort Rucker Main Post. The parties also agree that the federal government has only a proprietorial interest over Shell Field. They disagree, however, over whether the State of Alabama retained concurrent or partial jurisdiction over Cairns Field in the 1982 land transfer.[1]

Although the federal government may obtain land without the consent of a state, it may not obtain jurisdiction in such a manner. Before the 1937 decision of "the Supreme Court in *James v. Dravo Contracting Company* ..., it was the accepted view that the United States acquired exclusive jurisdiction over any lands purchased with the consent of the State for any of the purposes enumerated in article I, section 8, clause 17, of the Constitution...." *U.S. v. Corey,* 232 F.3d 1166, 1192 (9th Cir.2000). Therefore, "any provision of a State statute retaining partial or concurrent jurisdiction was inoperable. In the *Dravo* case[, however,] it was held that a State may properly retain partial or concurrent jurisdiction." *Id.* That is, "without the State's 'consent' the United States does not obtain the benefits of Art. I, s 8, cl. 17, its possession being simply that of an ordinary proprietor." *Paul,* 371 U.S. at 264, 83 S.Ct. 426 (citing *Dravo,* 302 U.S. at 141–42, 58 S.Ct. 208). Furthermore, irrespective of "whether the land is acquired by purchase or condemnation on the one hand or by cession on the other-a State may condition its 'consent' upon its retention of jurisdiction over the lands consistent with the federal use." *Paul,* 371 U.S. at 265, 83 S.Ct. 426 (citing *Dravo,* 302 U.S. at 146–49, 58 S.Ct. 208).

Under the National Labor Relations Act (NLRA), Congress provided that "nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein ...." 29 U.S.C. § 158(a)(3).[2] Congress, however, did not give universal application to this provision. Quite to the contrary, it further provided that "[n]othing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Terri-

---

1. "It is not unusual for property under federal control, including many military installations, to have been acquired piecemeal over extended periods of time by a variety of methods.... [T]he type of existing legislative jurisdiction may vary depending on when and how the specific tract was acquired." Stephen E. Castlen & Gregory O. Block, *Exclusive Federal Legislative Jurisdiction: Get Rid of It!,* 154 Mil. L. Rev. 113, 118 (1997)

2. In *Oil, Chemical & Atomic Workers, etc. v. Mobil Oil,* 426 U.S. 407, 409 n. 1, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976), the Supreme Court noted that Congress, in general, permits union security agreements known as union shop or agency shop agreements, but does not allow closed shop agreements. *Id.* A union shop agreement ensures that an employer will employ no one who does not join the union within a certain period of time after being hired. *Id.* An agency shop agreement provides that an employee does not have to join the union, but must pay the union, normally after thirty days, a sum equal to the union initiation fees and is obligated to make periodic payments to the union that are equal to the union dues. *Id.* Closed shop agreements, which are prohibited under NLRA § 8(a)(3)/29 U.S.C. § 158, provide that an employer will hire no one who is not a currently a member of the union at the time of being hired. *Id.*

tory in which such execution or application is prohibited by State or Territorial law." 29 U.S.C. § 164(b).

While § 8(a)(3)[3] articulates a national policy that certain union-security agreements are valid as a matter of federal law, § 14(b)[4] reflects Congress' decision that any State or Territory that wishes to may exempt itself from that policy. Section 14(b) allows a State or Territory to ban agreements "requiring membership in a labor organization as a condition of employment." We have recognized that with respect to those state laws which § 14(b) permits to be exempted from § 8(a)(3)'s national policy "[t]here is ... conflict between state and federal law; but it is a conflict sanctioned by Congress with directions to give the right of way to state laws ...." *Oil, Chemical and Atomic Workers Intern. Union, AFL–CIO v. Mobil Oil Corp.,* 426 U.S. 407, 416–417, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976) (quoting *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963)).

In *Lord v. Local Union No.2088, Int'l Bhd. of Elec. Workers, AFL–CIO,* 646 F.2d 1057, 1058 (5th Cir.1981), the former Fifth Circuit addressed "the question whether the Florida right-to-work law is applicable within federal enclaves over which the United States has exclusive jurisdiction."[5] The plaintiffs in *Lord* argued that 29 U.S.C. § 164(b), NLRA § 14(b), resolves the conflict between "section 8(a)(3) and the Florida right to work law, giving 'the right of way to State laws.'" *Id.* at 1062. The court, however, found that "Congress' direction in Section 14(b) 'to give the right of way to State laws' extends ... only to the area over which the state has power to legislate.'" *Id.* Thus, in a federal enclave where Congress, rather than the State has exclusive legislative jurisdiction, a State's right-to-work provision is inapplicable. *Id.*

The result follows in part from the nature of the continued existence of state laws in a federal enclave subject to exclusive federal jurisdiction. These state laws continue to exist within the exclusive federal enclave not because a state retains continuing legislative authority, but to assure that "no area however small will be left without a developed legal system for private rights." *James Stewart & Co. v. Sadrakula,* 309 U.S. 94, 99–100, 60 S.Ct. 431, 84 L.Ed. 596 (1940).[6] Thus, in a

---

**3.** 29 U.S.C. § 158(a)(3) is NLRA § 8(a)(3).

**4.** 29 U.S.C. § 164(b) is NLRA § 14(b).

**5.** The decision in *Lord* was reached on June 4, 1981. Decisions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent on this court. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

**6.** An area under exclusive jurisdiction is not wholly disconnected from the State. The Supreme Court stated as follows:

A state may conform its municipal structures to its own plan, so long as the state does not interfere with the exercise of jurisdiction within the federal area by the United States. Kentucky's consent to this acquisition gave the United States power to exercise exclusive jurisdiction within the

area. A change of municipal boundaries did not interfere in the least with the jurisdiction of the United States within the area or with its use or disposition of the property. The fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government. The sovereign rights in this dual relationship are not antagonistic. Accommodation and cooperation are their aim. It is friction, not fiction, to which we must give heed. *Howard v. Comm'rs of Sinking Fund of City of Louisville,* 344 U.S. 624, 626–27, 73 S.Ct. 465, 97 L.Ed. 617 (1953).

federal enclave subject exclusively to federal jurisdiction, "the applicable law is that of the new sovereign, plus any law of the old sovereign as it stood at the time of cession that is necessary to fill 'gaps' in the new sovereign's law, provided such old laws do not conflict with the laws of the new sovereign." *Vincent v. Gen. Dynamics Corp.*, 427 F.Supp. 786, 795 (N.D.Tex. 1977). "[L]ocal law not inconsistent with federal policy remain[s] in force until altered by national legislation." *Pac. Coast Dairy v. Dep't of Agric., of Cal.*, 318 U.S. 285, 294, 63 S.Ct. 628, 87 L.Ed. 761 (1943) (citing *James Stewart & Co.*, 309 U.S. at 99, 60 S.Ct. 431). No gap existed in federal law with regard to the legality of union shops; rather, federal law clearly authorized the use of such arrangements. *See* 29 U.S.C. § 158(a)(3). The State of Florida lacked the legislative jurisdiction necessary to qualify for having its state law take precedence. *Lord*, 646 F.2d at 1062. Accordingly, because Florida's right-to-work law directly conflicted with federal law with respect to the legality of the collective bargaining agreement that was before the court in *Lord*, the court held that its right-to-work law was unenforceable on federal enclaves that were subject to exclusive federal jurisdiction. *Id.* at 1063.

Seeking "advice as to whether Kings Bay Submarine Base is a federal enclave where the union security proviso to 8(a)(3) preempts a State right-to-work law, or ... [whether] the fact that there is concurrent federal and State jurisdiction at Kings Bay Submarine Base mean[s] that Georgia's right-to-work law applies[,]" a case was submitted to the Office of General Counsel for the NLRB. Op. Off. Legal Counsel of NLRB, Cases 12–CB–4828 (–1,–2,–3), 2001 WL 1155370, at *1 (May 1, 2001). The Office of General Counsel advised Rochelle Kentov, Regional Director, Region 12 of its

conclusion that "Georgia's right-to-work laws apply to the Employer since the state has concurrent jurisdiction with the federal government over Kings Bay Submarine Base." *Id.* at *2. Unlike in exclusive federal jurisdiction enclaves, the General Counsel reasoned that "concurrent legislative jurisdiction applies to property where the state reserved or obtained the right to exercise all legislative authority concurrent with the federal government. In these areas, both state and federal laws (civil and criminal) apply and both sovereigns may exercise their authority, including the state's right-to-work laws." *Id.* (citing *IAM Local Lodge 2771 v. Dyncorp*, 796 F.Supp. 976 (N.D.Tex.1991) (concluding that the Texas right-to-work law applied where state and federal government possessed concurrent jurisdiction); *Singleton v. IAM District 141*, 240 Va. 403, 397 S.E.2d 856 (1990) (holding that Virginia's right-to-work law applies at National Airport over which Virginia and the federal government have concurrent jurisdiction)).

■ As previously stated, the Supreme Court has "recognized that with respect to those state laws which § 14(b) permits to be exempted from § 8(a)(3)'s national policy '[t]here is ... conflict between state and federal law; but it is a conflict sanctioned by Congress with directions to give the right of way to state laws ....' " *Oil, Chemical and Atomic Workers Intern. Union, AFL–CIO v. Mobil Oil Corp.*, 426 U.S. 407, 416–417, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963)). While federal law does not give the right of way to state laws in a federal enclave with exclusive federal legislative jurisdiction, where the state retains concurrent legislative jurisdiction, the state has the power to legislate

over the area.[7]

■ Federal law provides that union security agreements will not be valid in any state or territory that prohibits them. 29 U.S.C. § 164(b). It is "the public policy of Alabama that the right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization." ALA. CODE. § 25–7–30 (1975). Union shop and agency shop agreements are prohibited under Alabama law:

> Any agreement or combination between any employer and any labor union or labor organization whereby persons not members of such union or organization shall be denied the right to work for said employer, or whereby such membership is made a condition of employment or continuation of employment by such employer, or whereby any such union or organization acquires an employment monopoly in any enterprise, is hereby declared to be against public policy and an illegal combination or conspiracy. ALA. CODE. § 25–7–3 (1975).

As to union shops, in the State of Alabama, "[n]o person shall be required by an employer to become or remain a member of any labor union or labor organization as a condition of employment or continuation of employment." ALA. CODE § 25–7–32 (1975). As to agency shops, Alabama law provides that "[n]o employer shall require any person, as a condition of employment or continuation of employment, to pay any dues, fees or other charges of any kind to any labor union or labor organization." ALA. CODE § 25–7–34 (1975). The Supreme Court has found that NLRA § 14(b)/29 U.S.C. § 164(b) encompass these type of agency shop agreements as well as union shop agreements, thereby allowing states to prohibit both of these types of agreements. *See Oil, Chemical & Atomic Workers, etc.*, 426 U.S. at 409 n. 2, 96 S.Ct. 2140. Because federal law and policy is to acquiesce to the states on this issue, this court holds that Alabama's right-to-work law extends to any area where the State of Alabama has the power to legislate, including where its jurisdiction is concurrent with the federal government. *See Lord,* 646 F.2d at 1062; *see also Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Dyncorp, Aerospace,* 796 F.Supp. 976, 982–86 (N.D.Tex.1991) (applying Texas right-to-work laws to Dyncorp's employees, who worked on a military base in an area where the federal and state govern-

---

7. Where the federal government seeks to have its law predominate, it retains the authority and capacity to achieve such a result. "The Constitution's Supremacy Clause and Property Clause ensure that federal interests in these areas are paramount, regardless of the federal government's interest in the lands involved." Stephen E. Castlen & Gregory O. Block, *Exclusive Federal Legislative Jurisdiction: Get Rid of It!*, 154 MIL. L. REV. 113, 115 (1997). The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judge in every State shall be bound thereby, any Thing in the Constitution or

Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Property Clause ensures that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State." U.S. CONST. art. IV, s. 3, cl. 2. Therefore, the Supreme Court has determined that federal lands "will be free from any such interference and jurisdiction of the state as would destroy or impair their effective use for the purposes designed." *Ft. Leavenworth R. Co. v. Lowe,* 114 U.S. 525, 539, 5 S.Ct. 995, 29 L.Ed. 264 (1885).

ment held concurrent jurisdiction).[8]

## B) Whether the State of Alabama Retained Concurrent Jurisdiction Over Cairns Field

■ Having concluded that a state right-to-work law applies where the federal government and state government hold concurrent jurisdiction, the court turns to considering whether the State of Alabama's jurisdiction over Cairns Field is concurrent or partial.[9]

The Alabama legislature has empowered the Governor under certain conditions and through certain procedures to cede jurisdiction to the federal government over land in the State of Alabama: [10]

> The Governor, upon application made to him in writing on behalf of the United States for that purpose, accompanied by the proper evidence of title in the United States describing the lands, is authorized on the part of the state, by patent to be recorded in the office of the Secre-

tary of State, to cede to the United States such jurisdiction as he may deem wise over such lands, to hold, to use and occupy the same for the purposes of the cession and none other. ALA. CODE. § 42–3–1 (1975).

The 1952 Land Patent had transferred exclusive jurisdiction over the original land, not including Cairns Field, by the following language:

> Now, therefore, I, Gordon Persons, as Governor of the State of Alabama, in the name and on behalf of the State of Alabama, and in accordance with the laws of said State, do hereby cede unto the United States of America **exclusive jurisdiction** over certain tract or parcel of land ... designated as Camp Rucker.... Joint Stipulation of Relevant Facts, Exhibit 5. (Emphasis added)

In 1982, the State of Alabama ceded jurisdiction to the federal government over other tracts of land, including Cairns

---

8. The court is aware that there is an Alabama Attorney General Opinion that reached the conclusion that pursuant to *Lord* Alabama's right-to-work statutes were inapplicable with regard to areas ceded in the 1952 and 1982 Land Patents. 214 Ala. Op. Att'y Gen. 46 (1989). The Plaintiff notes that under Alabama law, "[w]hile an opinion of the attorney general is not binding, it can constitute persuasive authority." *Alabama–Tennessee Natural Gas Co. v. Southern Natural Gas Co.*, 694 So.2d 1344, 1346 (Ala.1997) (citing *Poe v. Grove Hill Mem'l Hosp. Bd.*, 441 So.2d 861, 863 (Ala.1983)). "[T]he extent of the jurisdiction of the United States, is necessarily a federal question." *Silas Mason Co. v. Tax Comm'n of State of Washington*, 302 U.S. 186, · 197, 58 S.Ct. 233, 82 L.Ed. 187 (1937) (citing *Brewer–Elliott Oil & Gas Co. v. United States*, 260 U.S. 77, 87, 43 S.Ct. 60, 67 L.Ed. 140 (1922), *United States v. Utah*, 283 U.S. 64, 75, 51 S.Ct. 438, 75 L.Ed. 844 (1931), *Borax Consol. v. Los Angeles*, 296 U.S. 10, 22, 56 S.Ct. 23, 80 L.Ed. 9 (1935)). The court ultimately finds the reasoning of the Alabama Attorney General's Opinion to be unpersuasive. The Opinion fails to differentiate be-

tween the type of jurisdiction afforded in the 1952 and 1982 Land Patents. The Opinion also fails to note the importance of the exclusive federal legislative jurisdiction to the court's findings in its cited authority.

9. Because the court ultimately concludes that the State of Alabama retained concurrent jurisdiction, it does not reach the question of whether, as Defendants contend, the retention of concurrent criminal jurisdiction alone would be sufficient to enforce Alabama's right-to-work laws, or whether the preservation of the civil rights of inhabitants being secured in the 1982 Land Patent could itself make Alabama's right-to-work laws applicable.

10. Congress has created a similar procedure for the acceptance of jurisdiction. 40 U.S.C. § 3112 (formerly cited as 40 U.S.C. § 255). Congress has provided that "[i]t is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section." 40 U.S.C. § 3112(c).

Field. Joint Stipulation of Relevant Facts, Exhibit 6 (hereinafter "1982 Land Patent"). The Governor, authorized by the legislature "to cede to the United States such jurisdiction as he may deem wise[,]" ceded jurisdiction by the 1982 Land Patent with the following language:

> Now, therefore, I, Fob James, as Governor of the State of Alabama, in the name and on behalf of the State of Alabama, and in accordance with the laws of said State, do hereby cede unto the United States of America **concurrent legislative** jurisdiction over certain tracts ... [including] Cairns Army Air Field .... (Emphasis added)

The body of the 1982 Patent contained the following heading before the legal description of Cairns Field:

Parcel II

> Cairns Army Airfield, Alabama Description for Acquisition of Concurrent Legislative Jurisdiction From the State of Alabama

Under the 1982 Land Patent, the State of Alabama also reserved several specific jurisdictional powers:

> PROVIDED, that the State of Alabama expressly reserves concurrent power to enforce the criminal law and the jurisdiction so ceded shall not prevent the execution upon such lands of any process, civil or criminal, issued under the authority of this state, except as such process might affect the property of the United States thereon.

> PROVIDED, FURTHER, that the law of the State of Alabama and the judicial and administrative authority pursuant thereto shall continue to be applicable with respect to marriage, divorce, annulment, adoption, guardianship, commitment of the mentally incompetent, descent and distribution of property, notarizations, and inquests.

> PROVIDED, FURTHER, that the jurisdiction hereby ceded shall not cause inhabitants of the land herein referenced to be deprived of any civil or political rights, particularly the right to vote and attend state or local schools.

> PROVIDED, FURTHER, that this cession excludes, and specifically reserves unto the State of Alabama, legislative jurisdiction over State Highways 27 and 51, and the right-of-way easements associated therewith, traversing Fort Rucker Military Reservation.

> PROVIDED, FURTHER, that the State of Alabama expressly reserves the right to tax all persons, firms, corporations, or associations now or hereinafter residing or located upon said land; to tax the exercise by any person, firm corporation, or association of any and all rights, privileges, and franchises upon said land; and to tax property of all persons, firms, corporations, or associations situated upon said land.

> PROVIDED, FINALLY, that the jurisdiction ceded is for the purposes of the cession, and none other, and shall continue during the time the United States shall be or remain the owner thereof and shall use such land for the purposes of the cession, and the State of Alabama expressly reserves the right to exercise over or upon any such land any and all rights, privileges, powers, or jurisdiction which may now or hereafter be released or re-ceded by the United States of America to the State. 1982 Land Patent 11–12.

The Plaintiff argues that because these specific jurisdictional reservations and exclusion were included in the land transfer the court should interpret the 1982 Land Patent as reserving to the State of Alabama only partial jurisdiction over the specific categories enumerated, rather than concurrent legislative jurisdiction. To ac-

cept the Plaintiff's interpretation, the court would have to read the ceding language, transferring concurrent jurisdiction, as well as the language preceding the legal description, out of the Land Patent of 1982. In a post *James v. Dravo* era, the federal government only acquires the jurisdiction over federally owned lands which a state consents to confer. *Paul*, 371 U.S. at 264, 83 S.Ct. 426 (citing *Dravo*, 302 U.S. at 141–42, 58 S.Ct. 208). For a federal court to award to the federal government more jurisdiction than a state has explicitly conferred would be an aggressive intrusion upon a state's rights in our federal system and an odd default or presumption to create. To presume that the State of Alabama only intended to retain partial jurisdiction through these specific reservations, when it expressly made only a limited grant of concurrent legislative jurisdiction to the United States, would be to "allow the tail to wag the dog." It would be particularly odd in light of the fact that the Army's policy is to avoid assuming federal legislative jurisdiction except under exceptional circumstances. AR 405–20 at ¶ 5; *see also* Stephen E. Castlen & Gregory O. Block, *Exclusive Federal Legislative Jurisdiction: Get Rid of It!*, 154 MIL. L. REV. 113, 114 (1997) (noting that "current Army policy favors acquisition of only proprietary interests in land [and][e]xcluding state legislative authority now is not authorized without exceptional circumstances."). The Union's position requires the assumption that when a state transfers land to the United States, the United States thereby receives all legislative jurisdiction not reserved. That is simply not so; the United States receives only such jurisdiction as is given, reading the instrument of transfer as a whole.

In *Campbell v. Com. of Virginia*, the Virginia Court of Appeals, in considering whether the State of Virginia ceded exclusive jurisdiction to the federal government over Cheatham Annex, which is a military base, addressed an argument similar to that presented by the Plaintiff in this case. *Campbell v. Com. of Virginia*, 39 Va.App. 180, 571 S.E.2d 906, 909–11 (2002). Virginia by statute provides for the ceding of concurrent jurisdiction, but the presumption that the state only ceded concurrent jurisdiction can be overcome based upon "a clear manifestation of a specific intent to do so." *Id.* at 909–10. Campbell argued that the inclusion of a reservation of lesser included powers within the deed of transfer demonstrated that the state was only interested in retaining those powers, rather than in retaining concurrent jurisdiction. *Id.* at 910. The court rejected this argument. It found that "[t]he inclusion in the deed of a lesser-included power (the authorization to serve process) perhaps can be criticized as redundant. But it cannot be construed as an implied forfeiture of all incidents of dual sovereignty inherent in the concept of concurrent jurisdiction." *Id.* at 910–11.

The Alabama legislature allows a governor to transfer "such jurisdiction as he may deem wise ...." ALA. CODE. § 42–3–1 (1975). Fob James, the then Governor of the State of Alabama, explicitly ceded only "concurrent legislative jurisdiction" over Cairns Field. 1982 Land Patent. "Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, ...." *Kleppe*, 426 U.S. at 543, 96 S.Ct. 2285. The Supreme Court has ruled that the federal government cannot obtain legislative jurisdiction over federal lands without the consent of a state. *Paul*, 371 U.S. at 264, 83 S.Ct. 426 (citing *Dravo*, 302 U.S. at 141–42, 58 S.Ct. 208). It is difficult to conceive of a more egregious violation of the principles of federalism than stripping a state of its legislative authority over an area of land within its

borders when it expressly transferred only concurrent jurisdiction.

To view the reservations as negating the State of Alabama's express reservation of "concurrent legislative jurisdiction" simply requires more of a stretch than this court is prepared to make. There is no evidence as to why the specific reservations were included in the Patent; it could have been simply to give them special emphasis. Essentially, this court agrees with the assessment in *Campbell*, that even though a land transfer agreement between a state and the federal government may include redundant provisions, that redundancy should not be construed as a forfeiture of the dual sovereignty inherent in the concurrent jurisdiction that was expressly transferred, so as to transform the clear nature of the transfer to something less. *See Campbell*, 571 S.E.2d at 910–11. To so hold gives full effect to all language of the Patent. To hold otherwise would require an interpretation which would render void a provision of the Patent, and that provision being the express language of

the transfer itself. As noted earlier, the intent to limit the transfer to concurrent legislative jurisdiction was reinforced by the language preceding the legal description. Accordingly, this court finds that the State of Alabama ceded only concurrent jurisdiction, and thereby reserved and retained concurrent legislative jurisdiction over Cairns Field. Therefore, Alabama's right-to-work laws apply there.[11]

### C) The Job Situs Test and What Law Applies Where

■ The Plaintiff contends that pursuant to the job situs [12] test promulgated by the United States Supreme Court in *Oil, Chemical and Atomic Workers, etc. v. Mobil Oil*, 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976) the agency shop agreement applies to the entire CBA, and should be applied to Bernal, a bargaining unit member working at Shell Field, and also by implication to Hernandez, a bargaining unit member working at Cairns Field.[13]

---

**11.** The court notes that in 1992, and again in 1997, the Department of the Army, Mobile, Alabama District, Army Corps of Engineers, recognized in Jurisdiction Summaries that the jurisdiction ceded to the United States as to Cairns Field was concurrent jurisdiction. Attachment 7 to Joint Stipulation of Relevant Facts.

**12.** A job situs is where a person works, that is "the place where the work that is the very *raison d'etre* of the relationship is performed." *Oil, Chemical and Atomic Workers*, 426 U.S. at 417, 96 S.Ct. 2140.

**13.** Conversely, Bernal and Hernandez request that the court declare that LSSI does not have to enforce Article 3.1 of the CBA to employees who work on Shell Field, Cairns Field, or Main Post. There is no employee of LSSI before the court in this case who works on the Main Post. There is no indication in the stipulated relevant facts that an employee on Main Post is not in compliance with Article 3.1 of the CBA, or even that any employee on Main Post desires to not be a member of the Union,

much less refuses to pay agency fees. For purposes of this case, whether an employee on Main Post can maintain his or her employment with LSSI without joining the union or paying agency fees is little more than an academic question, rather than an Article III case or controversy that is before this court. Furthermore, Bernal and Hernandez do not have standing to seek a declaration that LSSI does not have to apply Article 3.1 of the CBA to employees on Main Post. For a party to have standing, there must be 1) an injury in fact that is a) concrete and particularized and b) actual or imminent, not conjectural or hypothetical, 2) a causal connection between the injury and the conduct complained of that is fairly traceable to the defendant, not a third party, and 3) likelihood that the injury is capable of being redressed through a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Neither Hernandez or Bernal has shown any injury in fact that is actual or imminent as opposed to conjectural or hypothetical. Neither works on the Main

The question before the Court in *Oil, Chemical and Atomic Workers* was whether "under § 14(b), Texas right-to-work laws can void an agency-shop agreement covering unlicensed seaman who, while hired in Texas and having a number of other contacts with the State, spend the vast majority of their working hours on the high seas." *Id.* at 410, 96 S.Ct. 2140. The Court found that "because of this close relationship between § 14(b) and job situs ... that § 14(b) does not allow enforcement of right-to-work laws with regard to an employment relationship whose principal job situs is outside of a State having such laws." *Id.* at 418, 96 S.Ct. 2140. Accordingly, the Court held that Texas right-to-work laws did not apply to seamen who worked primarily on the high seas and only ten to twenty percent of the time within the territorial bounds of Texas. *Id.* at 420, 96 S.Ct. 2140.

The Union contends that under *Oil, Chemical and Atomic Workers*, "the critical factor is 'the situs at which all the employees covered by the agreement perform most of their work.' ... Accordingly, the focus here must be on 'all the employees' performing work under the CBA and not only the employees working on Shell Field." Plaintiff Memorandum at 25 (internal citations omitted). By combining the members of the bargaining unit who work on portions of the Main Post covered by the 1952 Land Patent and Cairns Field, the Plaintiff reasons that over 82% percent of the employees perform their work outside of the jurisdiction in which Alabama's right-to-work laws are applicable. Thus, the Union argues that the job situs test requires that all the employees working at Shell Field should also be covered by the agency shop agreement, even though the federal government's interest over this area is merely proprietorial.

The Union acknowledges that in *Oil, Chemical and Atomic Workers* "all of the bargaining unit members worked at one job situs, *i.e.*, a ship sailing on the high seas, where state law had no application;" however, it argues that the job situs test also applies where various portions of the job situs are subject to a different jurisdictional status. Plaintiff's Memorandum at 25. The Plaintiff contends that because the vast majority of employees in the bargaining unit work in areas where Alabama's right-to-work laws have no application, consistent with *Vincent v. Gen. Dynamics Corp.*, 427 F.Supp. 786 (N.D.Tex.1977), the agency shop agreement is applicable to all employees covered by the contact.

There are at least three problems with the Plaintiff's analysis. First, the court, as explained above, concludes that Alabama's right-to-work statutes can be applied to employees working at Cairns Field because the State ceded only concurrent legislative jurisdiction to the federal government there. Accordingly, approximately 44.6%, rather than 82%, of the bargaining

Post or has shown any immediate intention or plan to return to working on the Main Post. In *Lujan*, the plaintiffs' intention to return "some day" to see endangered species was not sufficiently actual or imminent to constitute an injury in fact. *Id.* at 564, 112 S.Ct. 2130. In this case, there is no indication that any employee on Main Post is violating or intends to violate Article 3.1 of the CBA or that Bernal or Hernandez have plans to even return even "some day" to working on Main

Post. Accordingly, the court only addresses the issue of whether Alabama's right-to-work laws apply on Main Post insofar as it assumes arguendo in analyzing the Union's job situs argument that Alabama's right-to-work laws are not applicable on Main Post. It is unnecessary for the court to answer that question to resolve the present case/controversy before this court. The court exercises reasonable judicial restraint and declines to reach a conclusion that is only dicta.

unit employees work in areas where Alabama right-to-work statutes are inapplicable, with 55.4% of the employees working in areas subject to Alabama legislative jurisdiction and its right-to-work statutes.

Second, the Supreme Court in *Oil, Chemical and Atomic Workers* held "that under s 14(b), right-to-work laws cannot void agreements permitted by s 8(a)(3) when the situs at which all the employees covered by the agreement perform most of their work is located outside of a State having such laws." *Oil, Chemical and Atomic Workers*, 426 U.S. at 414, 96 S.Ct. 2140. The Plaintiff interprets this holding as requiring the employees to be treated collectively as one single group, rather than as individuals or smaller groups. *Oil, Chemical and Atomic Workers* presented a case where literally all of the covered workers, the unlicensed seamen hired to crew the tankers, were working in the exact same jurisdictional areas, ten to twenty percent of the time in Texas and the rest on the high seas. *Id.* at 411, 420, 96 S.Ct. 2140; *see also id.* at 422–23, 96 S.Ct. 2140 (Stewart, J. dissenting). The court treated the seamen as a single collective group precisely because "the situs at which all the employees covered by the agreement perform most of their work is located outside of a State having such laws." *Id.* at 414, 96 S.Ct. 2140 (emphasis added). Although there could be situations where it would be appropriate to treat employees who work within different jurisdictions as a single collective group for purposes of determining what jurisdiction's laws should apply, such a result is not necessarily dictated by *Oil, Chemical and Atomic Workers.*

Third, the Plaintiff's reading of *Vincent* is too expansive. Although that court

concluded that the state right-to-work laws were inapplicable in the case before it, the *Vincent* court noted that it "would like to reiterate that its holding in this case is not intended to necessarily foreclose a different result where the majority of the actual work situs is on land under state jurisdiction or where the federal-state boundary lines constitute reasonable dividing lines between different substantial segments of the labor force involved." *Vincent*, 427 F.Supp. at 799. The court in *Vincent* addressed a situation in which General Dynamics Corp. operated, developed, and built military aircraft for the United States and its allies at Air Force Plant # 4. *Id.* at 793. The plant for a variety of reasons developed and expanded on land that was subject to varying levels of jurisdictional control by the state and federal government. *Id.* at 790–94. Almost ninety-eight percent (97.93%) of the employees of the plant worked on land subject to the exclusive jurisdiction of the federal government, where the right-to work laws of the State of Texas were inapplicable.[14] *Id.* at 799. Approximately two percent (2.07%) of the employees of the plant worked on land under the jurisdiction of the State, outside the jurisdiction of the federal government. *Id.* The court applied federal union shop laws to that 2.07% not simply because the vast majority of employees worked exclusively under federal jurisdiction, but because in addition, the court found that "Air Force Plant # 4 appears to constitute one job situs ..." *Id.* The court concluded that Air Force Plant # 4 was "not practically divisible along federal-state boundary lines into different labor-force areas." *Id.* The facts of this case point towards the exact opposite conclusion. The parties

14. The court indicated that no workers were assigned to work on the 6.51 acres that arguably were subject to jurisdiction of the State of Texas and its right-to-work laws. *Vincent,* 427 F.Supp. at 799 n. 18.

conceptualize, discuss, and present three distinct, practically divisible, labor force areas: Main Post Fort Rucker,[15] Cairns Field, and Shell Field. Rather than one plant facility, where it is difficult for a court to draw divisions, the parties and the facts readily present three distinct areas, Main Post, which is subject to exclusive federal jurisdiction, Cairns Field, which is subject to concurrent State and federal jurisdiction, and Shell Field, over which the United States government merely has a proprietorial interest. Hernandez works exclusively on Cairns Field; Bernal works exclusively on Shell Field. Each works at a job situs that is subject to Alabama's right-to-work laws.

The Plaintiff argues that the hiring of all employees by LSSI on the Main Post provides further support for its contention that the agency shop agreement is applicable to Shell Field employees. The Union notes that this result follows "even under the view of the dissent in *Oil, Chemical and Atomic Workers* which believed 'that the place of hiring is the critical factor in determining choice of law for union security agreements.'" Plaintiff's Memorandum at 26. While the Plaintiff is correct that the two dissenting justices did find the place of hiring to be a critical factor, a majority of Court did not. Not only did the Court not find the place of hiring to be of significance, other factors connecting the employees to the State, other than the job situs, were also deemed to be of little significance. The Court found that "[w]hether taken separately or together, the place of hiring and the other factors on which respondent relies—the employees' place of residence, the locale of personnel records, the place at which payroll checks are written, etc. are not nearly as central

to the concerns of § 14(b) as the employees' job situs." *Oil, Chemical and Atomic Workers*, 426 U.S. at 418, 96 S.Ct. 2140.

The Plaintiff also contends that the ability of the employees to transfer between locations and for the Army to unilaterally transfer employees warrants a finding that Alabama's right-to-work laws are inapplicable. There is evidence that there have been transfers between the locations. In the fiscal year that ended on September 30, 2003, there were two transfers (one from Cairns Field to the Main Post and one from Cairns Field to Shell Field). In the fiscal year that ended on September 30, 2002, there were eleven transfers (eight from Cairns Field to the Main Post and three from the Main Post to Cairns Field). Also, in the late 1990s, the flight training portion of the Primary Division training was transferred from Lowe Field on Main Post to Shell Field. The Plaintiff contends that, because of the ability of employees to transfer and the Army to unilaterally relocate operations, the results would be unpredictable and in violation of *Oil, Chemical and Atomic Workers* if Shell Field and by implication Cairns Field employees were not required to join the union or pay agency fees.

The Supreme Court indicated that two practical considerations bolstered its conclusion that the job situs test was the appropriate one to determine what law would be applicable. The first practical consideration was that "the use of the job situs test will minimize the possibility of patently anomalous extra-territorial applications of any given State's right to work laws." *Oil, Chemical and Atomic Workers*, 426 U.S. at 418, 96 S.Ct. 2140. Extra-territorial application is not at issue in this case. The second practical consideration

---

**15.** The situation could, for example, potentially be more confused if the court were presented with a single facility on the Main Post of Fort Rucker, which was partially composed of land from the 1952 and 1982 Land Transfers.

underlying the job situs test is that "the parties entertaining a collective-bargaining agreement will be able to determine in virtually all situations whether a union—or agency-shop provision is valid." *Id.* at 419, 96 S.Ct. 2140. The court noted "[b]y contrast, bargaining parties would often be left in a state of considerable uncertainty if they were forced to identify and evaluate all relevant contacts of a jurisdiction in order to determine the potential validity of a proposed union-security provision." *Id.* The predictability referenced by the Supreme Court related to the differences between using a job situs test and multi-factored contacts test. It is unclear to the court how this type of predictability is undermined by applying the exact test that the Supreme Court directs courts to perform, that is using the job situs test to determine if Alabama's right-to-work laws apply separately on Cairns and Shell Field. Simply stated, three distinct jurisdictional areas and three distinct work sites are implicated in this case: the Main Post, which the parties agree is subject to exclusive federal jurisdiction and where presumably Alabama's right-to-work laws do not apply,[16] Cairns Field, which the State of Alabama and United States hold subject to concurrent jurisdiction, and Shell Field, upon which the United States merely has a proprietorial interest. There is little unpredictability in concluding that Alabama's right-to-work laws are applicable to Hernandez, who works on Cairns Field, and Bernal, who works on Shell Field, due to the respective job situs of each.

Therefore, the court finds that any job situs analysis must be made as to the three distinct work sites at Fort Rucker. Doing so, the court finds that Alabama's right-to-work laws apply to those who work on Cairns and Shell Fields.

## V. CONCLUSION AND ORDER

For the reasons discussed above, the court finds that Alabama's right-to-work laws apply to the Defendants Hernandez and Bernal, for the reason that they work on Cairns Field and Shell Field, respectively, the Defendants' Motion for Summary Judgment is due to be and is hereby ORDERED GRANTED to that extent; and the Plaintiff's Motion for Summary Judgment is due to be and is hereby ORDERED DENIED as to Defendants Hernandez and Bernal. A separate Judgement will be entered in accordance with this Memorandum Opinion and Order.[17]

### FINAL JUDGMENT

In accordance with the Memorandum Opinion and Order entered on this day it is hereby ORDERED as follows:

1. Judgment is hereby entered in favor of Defendants, Guadalupe Hernandez and Robert Bernal, and against Plaintiff Professional Helicopter Association, Office and Professional Employees International Union, Local 102. Defendant Lear Siegler Services, Inc., having taken no position on the merits of this case, but being a party, is also bound by this Final Judgment.

---

**16.** This court makes this assumption regarding Alabama's right-to-work laws not being applicable on the Main Post merely for purposes of advancing the Union's argument to the fullest extent. That is, even if the Alabama's right-to-work laws are not applicable to LSSI's employees on Main Post, those laws still remain applicable to its employees on Cairns Field and Shell Field. The court reaches no conclusion as to whether Alabama's right-to-work laws are actually applicable to LSSI's employees on Main Post.

**17.** Defendants have not briefed and argued their request for attorneys' fees, and the court deems any such claim to have been waived.

2. It is DECLARED that Article 3.1 of the CBA is not valid and is unenforceable against Guadalupe Hernandez and Robert Bernal, because they are workers on Cairns Field and Shell Field and the Alabama Right-to-Work Laws apply to workers there; that Hernandez and Bernal are not obligated to comply with the terms of Article 3.1 of the CBA, specifically, that Hernandez and Bernal as a condition of employment need not become or remain members of Local 102 or pay to Local 102 agency fees in an amount equal to the monthly dues and initiation fees regularly and uniformly required to be paid by members of Local 102.

3. It is DECLARED that Lear Siegler Services, Inc. is not obligated to enforce the terms of Article 3.1 of the CBA as to Hernandez and Bernal.

4. Costs are taxed against the Plaintiff and the Defendant Lear Siegler Services, Inc.